# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: DELTA/AIRTRAN BAGGAGE FEE ANTITRUST LITIGATION | CIVIL ACTION NO. 1:09-md-2089-TCB<br><br>ALL CASES |

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT AIRTRAN AIRWAYS, INC.'S MOTION TO DISMISS
# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT**................................................................... 1

**BACKGROUND AND CONTEXT** ...................................................... 2

    A.  Airline Industry Characteristics ................................................ 2

    B.  SEC Disclosure Regulations .................................................... 5

**ARGUMENT** ............................................................................................ 7

I.    Plaintiffs' Complaint, Post-*Twombly*, Must Plausibly Allege An
Antitrust Violation To Avoid Dismissal ....................................... 7

II.    Plaintiffs' Complaint Does Not Plausibly Allege A Sherman Act § 1
Violation..................................................................................... 10

    A.  A Plausible Section 1 Claim Must Be Premised On Actual
Agreement Rather Than Parallel And/Or Interdependent Conduct....... 10

    B.  Plaintiffs' Allegations, Stripped Of Conclusory Assertions, Do Not
Support A Claim of Agreement .............................................. 13

        1.  AirTran's Public Statements To Investors Cannot Plausibly Be
Construed As An Offer To Delta.......................................... 13

        2.  AirTran Could Not Plausibly Have Understood Delta's
Statements And Actions As Offers To Or Responses To AirTran .... 21

        3.  AirTran's Cooperation With Delta In Airport Negotiations With
The City of Atlanta (ATL) Provides No Support For Plaintiffs'
Conspiracy Allegations........................................................ 25

III.    Plaintiffs' Amended Complaint Fails To State A Plausible Claim
Against AirTran Under Sherman Act Section 2 ........................... 26

    A.  Plaintiffs Have Failed To Plead Predatory Or Anticompetitive
Conduct ................................................................................. 27

B.     Plaintiffs Have Failed To Plead That AirTran Acted With A Specific Intent To Monopolize ............................................................... 28

C.     Plaintiffs Have Failed To Plead A Dangerous Probability That AirTran Could Monopolize Any Relevant Market ............................... 29

IV.     Plaintiffs' Antitrust Claims, Even If Plausibly Stated, Must Be Dismissed To Avoid Conflict With AirTran's Responsibilities Under Securities Law ....................................................................................... 33

1.     The Antitrust Claims Arise In An Area Of Conduct Squarely Within The Heartland Of Securities Regulation ................................. 36

2.     The SEC Has Clear And Adequate Authority to Regulate AirTran's Disclosure Activity ............................................................ 37

3.     SEC Disclosure Regulation Is Active And Ongoing ........................ 37

4.     There Is A Serious Conflict Between Plaintiffs' Antitrust Theory And The SEC Regulatory Regime ...................................................... 37

**CONCLUSION** .................................................................................................. 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alaska Airlines, Inc. v. U.S. Department of Transportation*,
  575 F.3d 750 (D.C. Cir. 2009) .................................................................... 4

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) .................................................................... 2, 8, 9

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................... 2, 3, 7, 8

*Biovail Corp. International v. Hoechst Aktiengesellschaft*,
  49 F. Supp. 2d 750 (D.N.J. 1999) ............................................................ 31

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.*,
  203 F.3d 1028 (8th Cir. 2000) ...................................................... 12, 24, 23

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) .................................................................................. 11

*CIBA Vision Corp. v. De Spirito*,
  No. 1:09-cv-01343, 2010 WL 553233 (N.D. Ga. Feb. 10, 2010) ............. 9

*Conley v. Gibson*,
  355 U.S. 41 (1957) ..................................................................................... 7

*Credit Suisse Securities (USA) LLC v. Billing*,
  551 U.S. 264 (2007) ............................................................. 33, 37, 38, 39

*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*,
  637 F.2d 105 (3d Cir. 1980) .................................................................... 10

*Electronic Trading Group, LLC v. Banc of America Securities, LLC*,
  588 F.3d 128 (2d Cir. 2009) ................................................. 36, 37, 38, 39

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical System, Inc.*,
879 F.2d 1005 (2d Cir. 1989) .................................................................. 31

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
231 F. Supp. 2d 1253 (N.D. Ga. 2002),
*aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003) .............................................................. 20

*In re Elevator Antitrust Litigation*,
502 F.3d 47 (2d Cir. 2007) ..................................................................... 12

*In re Flat Glass Antitrust Litigation*,
385 F.3d 350 (3d Cir. 2004).............................................................. 11, 24

*In re High Fructose Corn Syrup Antitrust Litigation*,
295 F.3d 651 (7th Cir. 2002) .................................................................. 11

*In re Late Fee and Over- Limit Fee Litigation*,
528 F. Supp. 2d 953 (N.D. Cal. 2007)................................................. 9, 13

*In re LTL Shipping Services Antitrust Litigation*,
No. 1-08-M, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ................ *passim*

*In re Text Messaging Antitrust Litigation*,
No. C 7082, 2009 WL 5066652 (N.D. Ill Dec. 10, 2009)................. 24, 28

*In re Travel Agent Commission Antitrust Litigation*,
583 F.3d 896 (6th Cir. 2009).............................................................. 4, 13

*In re Travel Agent Commission Antitrust Litigation*,
No. 03-30000, 2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) .............. 24

*In re Valassis Communications Inc.*,
No. C-1460, 2006 WL 1367833 ( FTC Apr. 19, 2006)..................... 21, 27

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ................................................................ 12

*McGuire Oil Co. v. Mapco, Inc.*,
958 F.2d 1552 (11th Cir. 1992) ............................................................. 25

*Midwest Gas Services, Inc. v. Indiana Gas Co.*,
317 F.3d 703 (7th Cir. 2003) .................................................................. 31

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ......................................................................... 11, 23

*Morris Communications Corp. v. PGA Tour, Inc.*,
364 F.3d 1288 (11th Cir. 2004) ............................................................. 27

*SEC v. Capital Gains Research Bureau, Inc.*,
375 U.S. 180 (1963) ................................................................................. 6

*Silver v. New York Stock Exchange*,
373 U.S. 341 (1963) ............................................................................... 33

*Sinaltrainal v. Coca-Cola Co.*,
578 F.3d 1252 (11th Cir. 2009) .......................................................... 2, 8

*Spanish Broadcasting System of Florida, Inc. v.*
*Clear Channel Communications, Inc.*,
376 F.3d 1065 (11th Cir. 2004) ................................................ 26, 27, 28

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ............................................................................... 26

*Springfield Terminal Railway Co. v. Canadian Pacific Ltd.*,
133 F.3d 103 (1st Cir. 1997) ................................................................. 32

*Sun Dun, Inc. v. Coca-Cola Co.*,
740 F. Supp. 381 (D. Md. 1990) ...................................................... 32, 33

# TABLE OF AUTHORITIES
### (continued)

*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*,
   346 U.S. 537 (1954)..................................................................... 10

*U.S. Anchor Manufacturing Inc. v. Rule Industrial, Inc.*,
   7 F.3d 986 (11th Cir. 1993) ................................................. 29, 30

*United States v. Airline Tariff Publishing Co.*,
   836 F. Supp. 9 (D.D.C. 1995) .................................................... 20

*United States v. American Airlines, Inc*,
   743 F.2d 1114 (5th Cir. 1984) ............................................. 31, 32

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003) .......................................... 10, 20

## FEDERAL STATUTES, RULES AND REGULATIONS

49 U.S.C. § 47107(a)(1)............................................................. 4, 26

9 U.S.C. §47107(a)(i).................................................................... 25

49 U.S.C. § 47107(a)(2).................................................................. 4

14 C.F.R. pt. 16....................................................................... 4, 26

17 C.F.R. § 229.303(a)............................................................ 20, 22

17 C.F.R. § 229.303(a)(3)(ii) ......................................................... 6

17 C.F.R. § 229.305(a)(1) .............................................................. 6

17 C.F.R. § 229.305(b)(1).............................................................. 6

52 Fed. Reg. 13715 (Apr. 24, 1987) ............................................. 13

61 Fed. Reg. 31994 (June 21, 1996)........................................ 4, 26

# TABLE OF AUTHORITIES
(continued)

                                                                    **Page**

65 Fed. Reg. 51716 (Aug. 24, 2000) ............................................. 34

Fed. R. Evid. 201 ................................................................... 3

Fed. R. Civ. P. 8(a) ................................................................. 7

Fed. R. Civ. P. 12(b)(6)........................................................... 7, 8

# MISCELLANEOUS

V.I. Philip E. Areeda & Herbert Hovenkamp, Antitrust Law,
§1434B (2d. ed. 2003) ................................................... 11, 28, 29

# PRELIMINARY STATEMENT

Plaintiffs claim that AirTran and Delta used a series of public statements to investors and their joint negotiations involving Hartsfield-Jackson Atlanta International Airport ("ATL") to reach an agreement "not to compete and to coordinate business strategies [including initiation of a first bag fee] to increase prices to consumers." (Consolidated Amended Class Action Complaint ("Complain" or "CAC") ¶ 1). Alternatively, Plaintiffs claim that certain of AirTran's public statements were unaccepted "invitations to collude" with Delta, made with the specific intent to monopolize (CAC ¶¶ 90-92) either all nation-wide city-pair routes on which *either* AirTran or Delta provided service (CAC ¶ 66) or certain unspecified city-pair routes to and from Atlanta (CAC ¶ 67). Plaintiffs assert that these "invitations" had a dangerous probability of succeeding in monopolizing the alleged relevant markets because, taken together, AirTran and Delta account for 92 percent of domestic passenger enplanements in Atlanta. (CAC ¶ 92).

Plaintiffs make no claim of express agreement and plead no consequent facts – *e.g.,* coordinated fare increases on specific routes, withdrawal, or realignment of capacity on AirTran/Delta overlap routes – to support their allegation of coordinated business strategy save for the allegedly contemporaneous

implementation of a first bag fee.  Plaintiffs invoke instead joint efforts to negotiate with the City of Atlanta and the coincidental presence of AirTran and Delta executives at public investor conferences.  Thus, the plausibility of Plaintiffs' allegations of antitrust violation stands or falls on Plaintiffs' self-serving interpretations of the investor communications set forth in the Complaint, the reasonableness of the "information and belief" inferences Plaintiffs seek to draw from them, and the joint discussions between AirTran, Delta, and the City of Atlanta.  *Sinaltrainal v. Coca-Cola Company*, 578 F.3d 1252 (11th Cir. 2009) (rejecting conspiracy allegations "based on information and belief" that are without "factual content" as "vague and conclusory").

Taken in the context of inherent airline industry characteristics, securities law disclosure guidelines, and "judicial common sense" as required by the Supreme Court and the Eleventh Circuit, Plaintiffs' complaint fails to cross the plausibility threshold necessary to survive a Rule 12(b)(6) challenge.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009).

## BACKGROUND AND CONTEXT

### A.   <u>Airline Industry Characteristics</u>

Four fundamental characteristics of the airline industry provide context essential to interpreting the statements and airport negotiations at issue.  Each is

manifested in the earnings calls and conference presentations on which the

Complaint relies and companion SEC filings and/or arises from regulatory rules.[1]

1. <u>Air transportation is a consumer product sold on both a current and future (advance booking) basis.</u> An airline's capacity/schedules and pricing/fares must be publicly available and are readily accessible to its competitors. (CAC ¶ 43), U.S. Department of Transportation, *Aviation Industry Performance, A Review of the Aviation Industry in 2008*, at 11 n.13 (Publication No. CC-2009-039, May 6, 2009) ("2009 DOT Report") (Joint Appendix Exhibit ("Appx. Exh.") 48). Public disclosure of schedules and fares extends over the booking horizon (9-12 months) and capacity plans cannot be kept secret. Future sales/advance bookings benefit consumers and provide critical liquidity to airlines when, and if, credit card companies release funds arising from purchases charged by consumers prior to flight. (AirTran 2007 10-K, Feb. 4, 2008 at 13 (Appx. Exh. 10).)

2. <u>Airlines use common, publicly-owned facilities (airports) to provide their services.</u> Under federal law, publicly-owned airports like ATL receive substantial financial assistance from the Federal Aviation Administration

---

[1] The Supreme Court noted in *Twombly* that on motions to dismiss, district courts are "entitled to take notice of the full contents of [materials] referenced in the complaint." 550 U.S. at 569 n.13 (citing Fed. R. Evid. 201).

("FAA"). Airports, in turn, are required to non-discriminatorily charge airlines on the basis of reasonably incurred costs and to make facilities available on a common, nondiscriminatory set of terms and conditions. Airlines have a legitimate common interest in enforcing these requirements to reduce their airport operating costs. 49 U.S.C. §§ 47107(a)(1), (2); 14 C.F.R. Part 16; DOT Policy Regarding Airport Rates and Charges, (Principles 2, 3), 61 Fed. Reg. 31994 (June 21, 1996); *see also Alaska Airlines v. U.S. Dep't of Transp.*, 575 F.3d 750 (D.C. Cir. 2009).

3. The number of airline competitors on any city-pair route is limited. Airlines, like other firms in markets with a limited number of competitors, react to each other's competitive initiatives and consider potential competitor reactions in taking their own initiatives. *See, e.g.*, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910 (6th Cir. 2009); *see also* AirTran 2007 10-K, Feb. 4, 2008 (Appx. Exh. 10).

4. All U.S. airlines faced critical financial problems in 2008 arising from a massive spike in jet fuel prices and a demand-dampening recession. (CAC ¶¶ 27, 60). Containing non-fuel costs, increasing planeload revenues to cover unavoidable fuel price increases and maintaining investor and credit card company confidence in this crisis period was essential to the preservation of those airlines that survived. All domestic carriers reduced capacity in order to improve

average revenues and cover higher costs.  Most domestic carriers instituted

ancillary fees, including first bag fees, to generate much needed revenue during

2008.  *See* 2009 DOT Report at 4, 10-11 (Appx. Exh. 48).

### B.    SEC Disclosure Regulations

AirTran and Delta are public companies subject to the securities laws and

Securities and Exchange Commission ("SEC") disclosure regulations.  Information

available to investors and regulators under this mandatory regime is also freely

available to competitors.[2]  As airlines comply with SEC disclosure regulations and

seek to retain investor and credit card company confidence in their ability to

operate profitably, a vast amount of information on past operations and future

strategic direction is routinely made available to the public and airline competitors.

SEC regulations tell public companies like AirTran what information they

must publicly disclose (*i.e.*, "material" information about the company) and when

they must disclose it  (*i.e.,* Annual 10-K, Quarterly 10-Q, prompt 8-K disclosure of

material events or changes to prior disclosures).  Furthermore, Regulation S-K,

Item 303, mandates the presentation of "Management's Discussion and Analysis of

Financial Condition and Results of Operation" ("MD&A") in Form 10 filings.

Management must analyze past performance and "[d]escribe any known trends or

---

[2]  All SEC filings, including those cited here, are publicly available at
http://www.sec.gov/edgar.shtml.

uncertainties that . . . the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §§ 229.303(a)(3)(ii), *see also* 229.305(a)(1), 229.305(b)(1). Management is directed to include all forward-looking information "reasonably likely to have a material effect" on the company's financial condition, SEC Release 33-6835, including the company's primary risk exposures and "the objectives, general strategies, and instruments, if any, used to manage those exposures." 17 C.F.R. § 229.305(b)(1). Management should not limit its discussion to the company, but should also assess "economic or industry-wide factors relevant to the company." SEC Release 33-8350. Reporting material changes in future capacity planning is fully consistent with SEC disclosure regulations, regardless of whether capacity will be increasing, as in 2007 for AirTran (*see, e.g.*, AirTran 2006 10-K, March 1, 2007 (Appx. Exh. 3); AirTran Q3 2007 10-Q, Nov. 5, 2007 (Appx. Exh. 6)), or decreasing, as in 2008. *See generally* 2009 DOT Report. (Appx. 48); *see also* Exh. A (Index of AirTran Public Statements Regarding Capacity.)

In short, the SEC wants investors to know not only how the company has performed and why, but also threats to future performance and how management intends to meet them. Thoughtful, candid, and complete disclosure of

management's analysis of results and its goals and strategies for future operation is essential to the intelligent, fully-informed investment decisions the securities laws are intended to promote. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963).

Viewing this case in context makes it apparent that each of the statements and actions alleged in Plaintiffs' Complaint is fully consistent with independent business conduct and regulatory matters. The fanciful conspiracy constructed by Plaintiffs cannot cross the plausibility threshold of Federal Rules 8(a) and 12(b)(6).

## ARGUMENT

### I. Plaintiffs' Complaint, Post-*Twombly*, Must Plausibly Allege An Antitrust Violation To Avoid Dismissal.

The Supreme Court's landmark decision in *Twombly*, as further elaborated in *Iqbal*, and discussed by the Eleventh Circuit in *Sinaltrainal*, requires that Plaintiffs' complaint provide sufficient factual "heft" to "plausibly" establish an antitrust violation. *Twombly*, 550 U.S. at 557. *Twombly* makes clear that a plaintiff's obligation to state adequate grounds for relief under Fed. R. Civ. P. 8(a) "requires more than labels and conclusions." 550 U.S. at 555.[3] Rather, where

---

[3] In *Twombly*, the Court expressly rejected the oft quoted language from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Court noted that this statement has "earned its retirement" as an "incomplete, negative gloss" on the accepted pleading standard. *Twombly*, 550 U.S. at 563.

Sherman Act conspiracy claims are made, a complaint must include "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. The factual allegations must demonstrate the plausibility, not just possibility, of an anticompetitive agreement. *Id.* Alleged facts that are merely consistent with an unlawful agreement, but equally compatible with independent action, will not suffice. *Id.* at 556-57.

To withstand a Rule 12(b)(6) challenge, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" because "parallel conduct does not suggest conspiracy." *Id.* at 556-57. Rather, a Sherman Act complaint must supply additional facts "pointing toward a meeting of the minds," such as "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *Id.* at 557 & n.4.

In *Iqbal*, the Supreme Court provided further guidance on applying *Twombly*. First, the court must identify the factual elements legally required to establish the plaintiff's claims, 129 S. Ct. at 1947-49. Second, the court must separate factual allegations from "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950.[4] Third, the

---

[4] *See* Delta Memo. Exh. B for a redline separation of facts and conclusory assertions in Plaintiffs' complaint.

court must "draw upon its judicial experience and common sense" to determine on a "context specific" basis whether the "well-pleaded facts"[5] rise to the level of plausibility rather than the "mere possibility of misconduct." *Id.* at 1949-50. If the complaint is not "plausible on its face," it must be dismissed. Dismissal cannot be deferred to permit further discovery, however limited, to search for additional facts that might nudge a plaintiff's case over the plausibility threshold. *Id.* at 1953.

Since *Twombly*, this District Court and courts throughout the country have not hesitated to dismiss Section 1 claims that failed plausibly to plead an actual agreement. Last year, in *In re LTL Shipping Services Antitrust Litigation* ("*LTL Shipping*"), this Court dismissed a complaint alleging an agreement to set fuel surcharges noting that "it is plausible that the Defendants' assessment of fuel surcharges was directly the result of increased price of diesel fuel, not an anticompetitive conspiracy." No. 1-08-MD-01895-WSD, 2009 WL 323219, at *16 (N.D. Ga. Jan. 28, 2009); *see also CIBA Vision Corp. v. De Spirito*, No. 1:09-cv-01343, 2010 WL 553233 (N.D. Ga. Feb. 10, 2010); *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007). As shown below, Plaintiffs' Section 1 allegations similarly fail to meet the plausibility threshold and Plaintiffs'

---

[5] The Eleventh Circuit does not treat allegations made "on information and belief" as well pleaded facts. *Sinaltrainal*, 578 F.3d at 1268.

Section 2 allegations are inadequate as a matter of law.  Thus, the Complaint against AirTran must be dismissed in its entirety.

## II.    Plaintiffs' Complaint Does Not Plausibly Allege A Sherman Act § 1 Violation.

### A.    A Plausible Section 1 Claim Must Be Premised On Actual Agreement Rather Than Parallel And/Or Interdependent Conduct.

A Sherman Act § 1 violation requires establishing a "contract, combination or conspiracy in restraint of trade."  Since the Supreme Court's seminal decision in *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537 (1954), this language has been interpreted to require "a conscious commitment to a common scheme."  *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980).  The element of agreement – in the ordinary sense of exchange of commitments – is the key to distinguishing lawful interdependent conduct from actionable conspiracy.  *Williamson Oil Co. v. Philip Morris USA,* 346 F.3d 1287, 1302 (11th Cir. 2003).

Thus, to make their Section 1 claim of a "contract, combination or conspiracy" between AirTran and Delta "plausible," Plaintiffs must allege facts that support a reasonable inference of actual agreement between AirTran and Delta.  But Plaintiffs allege no such facts.  Instead, Plaintiffs build a house of cards– a little bit of parallel conduct along with a handful of selected, but

legitimate, disclosures to shareholders and investors.  That is not enough.  To the contrary, to survive the motion to dismiss, Plaintiffs' complaint must allege facts that support an "actual, manifest agreement" establishing proof "that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan."  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004) (quoting VI Philip E. Areeda & Herbert Hovenkamp, Antitrust Law, § 1434b, at 243 (2d ed. 2003)); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) ("[I]t is generally believed . . . that an express, manifested agreement, and thus an agreement involving *actual*, *verbalized* communication, must be proved in order for a price fixing conspiracy to be actionable under the Sherman Act." (emphasis added)).

The courts have long recognized that competitors in concentrated markets will pay close attention to each other's actions and may maximize their own interests by matching rivals' conduct, particularly when all competitors are subject to the same external pressures.  *See LTL Shipping*, 2009 WL 323219, at *16.  The Supreme Court has described this as "the process, *not in itself unlawful*, by which firms [might set] prices at a profit-maximizing, supracompetitive level by

recognizing . . . their interdependence." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (emphasis added).[6]

Thus, to make their claim of a "contract, combination or conspiracy" between AirTran and Delta "plausible," Plaintiffs must allege more than mutual awareness of each other's general capacity and fee strategies and contemporaneous initiation of first bag fees and capacity reductions. But the complaint alleges no facts demonstrating agreement; Plaintiffs do not allege facts that, if true, demonstrate that Defendants' actions arose from an express, verbalized exchange of commitments or at least more than conduct that could just as well have been caused by independent, if interdependent, decisions. *See, e.g.*, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048-49 (9th Cir. 2008) (affirming dismissal of an antitrust conspiracy claim against credit card companies and banks, stating that "[a]llegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws"); *In re Elevator Antitrust*

---

[6] Similarly, the Supreme Court has held that a pricing decision by a distributor influenced by a manufacturer's express recommendation cannot sustain a conspiracy claim under Section 1 unless "the distributor communicated its acquiescence or agreement, and . . . this was sought by the manufacturer." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 n.9 (1984). Although *Monsanto* addressed § 1 conspiracies in the context of a vertical distributor-termination case, courts apply it equally in horizontal cases. *See, e.g.*, *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*, 203 F.3d 1028, 1032 (8th Cir. 2000) ("We are among the majority of circuits to apply *Monsanto* and *Matsushita*, broadly, and in both horizontal and vertical price fixing cases.").

*Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (affirming dismissal of conspiracy and monopolization claims against elevator sellers and service providers because, *inter alia*, parallel conduct "can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy").

**B.      Plaintiffs' Allegations, Stripped Of Conclusory Assertions, Do Not Support A Claim of Agreement.**

**1.      AirTran's Public Statements To Investors Cannot Plausibly Be Construed As An Offer To Delta.**

Plaintiffs allege that AirTran used a series of 2008 quarterly earnings calls and investor conference presentations to seek and enter into an agreement with Delta to increase prices by reducing capacity and introducing first bag fees.  (CAC ¶¶ 28-29).[7]  However, none of the statements quoted in the complaint, absent Plaintiffs' editorializing, conditions any AirTran action on Delta's actions, makes any other "offer" from AirTran to Delta, or signals recognition or acceptance of any "offer" made by Delta to AirTran.  The statements echoed AirTran's formal SEC filings and provided critical insight to AirTran's investors and lenders. Consistent with SEC regulations, AirTran gave them the ability to see AirTran's

---

[7]  Plaintiffs' allegation that AirTran and Delta both participated in certain investor conferences and held separate "break out" sessions adds no plausibility to the complaint.  A so-called opportunity to conspire cannot plausibly sustain a claim of agreement.  *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009); *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 963 (N.D. Cal. 2007).

projected crisis response to the fuel/recession crisis "through the eyes of management." Securities Act Release No. 6711, 52 Fed. Reg. 13715, 13717 (April 24, 1987). AirTran's and Delta's allegedly similar strategic responses to runaway jet fuel prices and a major, demand-dampening recession are fully consistent with their individual interests, and similar capacity reduction plans were universally put into effect by the entire domestic airline industry in 2008. *See* DOT 2009 Report (airport-by-airport chart of capacity changes). This Court was not surprised that trucking companies responded in parallel fashion to volatile fuel prices in that industry, and concluded in those very analogous circumstances that the apparently similar responses of the trucking companies was insufficient to support a plausible conspiracy claim. *See LTL Shipping*, 2009 WL 323219 at *17-*18 (parallel imposition of surcharge to deal with increased fuel costs not inconsistent with independent conduct); *see also* 2009 DOT Report at *ii*. (Appx. Exh. 48.)

### a. April 22, 2008 Earnings Call.

Plaintiffs initially assert that AirTran's April 22, 2008 earnings call, rescheduled from April 24, was used to "signal" Delta of "a desire to jointly reduce capacity . . . and to give Delta the opportunity to respond during Delta's upcoming

call." (CAC ¶ 32). But Plaintiffs' conclusory interpretation cannot plausibly overcome:

(i) The re-scheduling of the April earnings call so that AirTran could respond to investor inquiries on the day it issued registration statements supporting $150 million of new securities. (AirTran Form 424B3, April 22, 2008 (Appx. Exh. 16));

(ii) The equivalent disclosure of AirTran's revised capacity plan in the April 22 registration statement, as well as other contemporaneous SEC filings (AirTran Form 424B3, April 22, 2008 (Appx. Exh. 16));

(iii) The absence of any specific statement as to actions AirTran might take on routes on which it competed with Delta;

(iv) The need for AirTran to assure investors that it had a plan overcome the fuel price spike and first quarter 2008 losses disclosed in the earnings call and AirTran's contemporaneous SEC-regulated registration statement and quarterly report (*see* AirTran Q1 2008 10-Q, April 23, 2008 (Appx. Exh. 19)); and

(v) The public disclosure to AirTran investors in SEC filings long prior to April 22 that rising fuel prices would curtail AirTran's growth plan (*see* AirTran Form 8-K, March 19, 2008 (Appx. Exh. 14).)

15

**b.**    <u>July 29, 2008 Earnings Call and September 28, 2008 Caylon Conference</u>

Plaintiffs next assert that AirTran used its July 29, 2008 earnings call to assure Delta that AirTran would accelerate capacity cuts and concentrate on raising fares in response to prior Delta comments that "industry" capacity should be cut by 10 percent and an alleged Delta threat to retaliate against AirTran if AirTran did not comply. (CAC ¶¶ 43, 44, 46, 47, 48). Plaintiffs' conclusory allegations again fail to support a plausible inference of conspiracy considering:

(i)    The much lower actual 2008 capacity reductions at Atlanta (3%) compared to industry-wide reductions, 2009 DOT Report;

(ii)    The absence of any specific mention of Delta, Atlanta, or of actions in any city-pair markets in which AirTran and Delta competed; and

(iii)    The disclosure by AirTran in a series of filings with the SEC (March 19, 2008 8-K (Appx. Exh. 14); April 22, 2008 8-K (Appx. Exh. 17); June 16, 2008 8-K (Appx. Exh. 28); June 19, 2008 8-K (Appx. Exh. 31))—long before Delta's allegedly threatening remarks on July 16, 2008—that AirTran would be substantially reducing its capacity in September to stem mounting losses caused by the burden and uncertainty of jet fuel prices disclosed in AirTran's second quarter 10-Q filing.

Plaintiffs also assert that AirTran's presentation at the Caylon Securities Airline Conference on September 18, 2008 confirmed that AirTran had sold aircraft, deferred planned deliveries and was projecting reduced capacity in 2009 even though crude oil prices had abated, and demonstrated that "collusion with Delta had fundamentally changed AirTran's business strategies." (CAC ¶ 51). Plaintiffs' conclusory interpretation is, however, belied by:

(i)     AirTran's need to confront a major recession which showed no signs of abating in 2009, *see generally* 2009 DOT Report (Appx. Exh. 48); and

(ii)    AirTran's unilateral strategic decision, disclosed to its investors early in and throughout 2008, that a drastic turnaround of AirTran's growth strategy was necessary for AirTran to survive.

Plaintiffs speculate that AirTran could "sustain losses and wait for the price of oil to abate" (CAC ¶ 27), but AirTran management recognized that inertia was the road to bankruptcy. AirTran's SEC filings candidly disclosed that raising planeload revenues to offset the enormous increase in operating costs experienced in 2008 and avoiding further losses by reducing capacity where there were no prospects for covering costs were critical to AirTran's survival. Moreover, through at least the first seven months of 2008, AirTran was hedging against further fuel

price increases and saw no prospect that fuel prices would "abate." (AirTran Q2 10-Q, August 11, 2008 (Appx. Exh. 37)).

### c.    October 23 Earnings Call

Last, Plaintiffs assert that AirTran used its October 23, 2008 earnings call to "warn" Delta that AirTran was prepared to resume aggressive competition if Delta did not restrict its capacity in Atlanta. Again, Plaintiffs' conclusory allegations and strained interpretation of the call cannot be squared with:

(i)    The plain words of Mr. Fornaro's statement, while acknowledging that Delta had a capacity advantage in markets where it competed with AirTran, assured investors that AirTran had shown itself to be "a pretty tough competitor." (CAC ¶ 54). Recognizing that "oil's come down quite a bit" so that AirTran "had a lot more flexibility to manage our revenue base," Mr. Fornaro told his investors that AirTran could be "more aggressive in the marketplace" and offset Delta's capacity advantage, *id.*; and

(ii)    The absence of any indication that AirTran's taking a "more aggressive" market stance would in any way be conditioned on Delta's capacity actions.

Plaintiffs further interpret Mr. Fornaro's October 23, 2008 spontaneous response to an analyst's question regarding first bag fees as an invitation to Delta

to initiate such a fee with AirTran to follow. (CAC ¶¶ 28, 55). Plaintiffs'
conclusory interpretation, however, ignores:

> (i)     Mr. Fornaro's plain words which simply explained to
investors why AirTran, notwithstanding its previously disclosed interest in
ancillary fees and the widespread use of first bag fees by other airlines, did not
have a first bag fee (AirTran Q2 10-Q, August 11, 2008 (Appx. Exh. 37)); and

> (ii)    The absence from Mr. Fornaro's statement of any
specifics on the amount of first bag fee AirTran might "strongly consider" in
changed competitive circumstances, the fare categories to which it might apply, or
whether, as with its then-existing second bag fees, AirTran would set any first bag
fee below a comparable Delta fee.

In short, Plaintiffs' efforts to "spin" AirTran's public statements to investors
during a crisis period as a pattern of "offers and acceptances" is cut from whole
cloth. AirTran's initiation of a first bag fee, which imposed added costs only on
those passengers who generated them, was a rational, unilateral response to the
competitive situation on November 12, 2008. Similarly, AirTran's investors, and
equally importantly the credit card companies holding its advance booking
proceeds, needed reassurance that AirTran management had a revenue and
capacity plan that could withstand the storm of fuel price increases and recession.

AirTran management had a responsibility under the securities laws and an overwhelming business interest in disclosing its strategic direction. AirTran had no expectation that its growth strategy could be hidden from Delta, or any other competitor, because its aircraft sales and deferrals were material financial events already disclosed, consistent with SEC regulations, *see, e.g.*, AirTran Form 424B3, April 22, 2008 (Appx. Exh. 16); AirTran Q2 2008 10-Q, August 11, 2008 (Appx. Exh. 37), and its actual schedule changes would be public information. Thus, AirTran's actions and statements plausibly reflect only a vigorous pursuit of its unilateral interests in an intensely competitive market.

This Court has previously determined that finding an agreement from "indirect [public] communications" must show "detailed communications with no public purpose" *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1276 (N.D. Ga. 2002), *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003). Here, the public statements on which Plaintiffs rely lack any detail with respect to the deployment of capacity or the initiation/administration of a first bag fee. Moreover, AirTran's statements in earnings calls reiterated or clarified information of public record in prior or contemporaneous mandatory SEC filings and addressed "known trends or uncertainties" that may affect liquidity, capital resources, net sales, revenues or

income and to "provide insight into material opportunities, challenges and risks";

"economic or industry-wide factors relevant to the company"; and "the actions

[management] are taking to address them." 17 C.F.R. § 229.303(a); SEC Release

33-8350. Thus, Plaintiffs clearly have failed to meet the legal standard for

pleading a statement-based Section 1 conspiracy. *Compare, e.g.*, *United States v.*

*Airline Tariff Publ'g Co.*, 836 F. Supp. 9 (D.D.C. 1995) (upholding antitrust

consent decree banning use of fare dissemination service to signal and negotiate

through posting of not-for-sale advance fares on specific routes); *In Re Valassis*

*Commc'ns Inc.*, No. C-1460, 2006 WL 1367833 (FTC Apr. 19, 2006) (use of

quarterly earnings call to propose a market share allocation and specific prices to a

designated competitor with a call for response in "short order.")

      2.    **AirTran Could Not Plausibly Have Understood Delta's**
                **Statements And Actions As Offers To Or Responses To**
                **AirTran.**

Plaintiffs also allege that Delta used its first and second quarter earnings

calls on April 23, 2008 and July 15, 2008 and its presentation to the Merrill Lynch

Transportation Conference on June 18, 2008 to signal that Delta sought additional

AirTran capacity cuts and that Delta would reciprocate or retaliate depending on

AirTran's reaction. (CAC ¶¶ 37-45). Plaintiffs conjecture that AirTran responded

to Delta in AirTran's July 29, 2008 earnings call and that, after that call, "Delta no longer felt constrained by vigorous competition from AirTran."  (CAC ¶¶ 46-49).

None of Delta's April 23 statements, however, specifically addressed AirTran, and Delta's remarks about "the industry" most plausibly refer to the numerous rivals faced by Delta, a major domestic and global network airline. (CAC ¶¶ 13, 37).  Delta, having then recently emerged from bankruptcy, was also incurring large losses because of rising fuel prices, and had an equal SEC responsibility to explain its strategy for dealing with fuel risks.  (CAC ¶¶ 37-38). Delta's observations that the success of its strategy would depend on the competitive situation created, in part, by the independent actions of its worldwide competitors, and that Delta would, if necessary, defend its market share in Atlanta, were properly addressed to the "challenges and risks"  Delta perceived under 17 C.F.R. § 299.303(a).  Delta's statement that its 2009 capacity would take into account competitor plans as evidenced by the "tapes" (CAC ¶ 43) – *i.e.*, the public posting of actual schedules – indicated, if anything, that Delta gave little weight to general capacity forecasts in earnings calls.  Delta's decision, announced October 15, 2008, to reduce 2009 capacity in the face of growing recession was unremarkable.  AirTran made no mention of Delta's plans in its subsequent October 23, 2008 earnings call. (Appx. Exh. 41).

Plaintiffs attempt next to portray Delta's November 5, 2008 announcement of a first bag fee as part of the purported broad understanding between AirTran and Delta. (CAC ¶ 56). Plaintiffs shunt aside as "pretextual" the explanation that Delta's merger with Northwest, approved by the Department of Justice and closed on October 29, 2008, caused Delta to institute the first bag fee. (CAC ¶ 62). Merger was an obvious reason for Delta to harmonize the differing fee schedules of Delta and Northwest, and Delta chose to adopt Northwest's bag fees, initiating a $15 first big fee and reducing its second bag fee from $50 to $25. *See* Delta Airlines Press Release, *Delta Aligns Policies and Fees*, Nov. 5. 2008 (Appx. Exh. 43). Delta's announcement on November 5 was unconditional and contained no suggestion that Delta would modify its bag fees in response to any AirTran action or inaction. AirTran's decision to match Delta's first bag fee a full week later was consistent with AirTran's unilateral "follower" strategy and with AirTran's announced focus on restoring its profitability as promptly as possible.

Plaintiffs' attempt to create a plausible inference of conspiracy by stringing together snippets from investor calls providing general strategy analysis makes clear the wisdom of restricting Sherman Act Section 1 offenses to "conscious commitments" to a common scheme. *Monsanto*, 465 US at 764. Under Plaintiffs' theory, Delta's April 24, 2008 observation that a reduction in industry capacity

would benefit Delta presented AirTran with the Catch 22 choice: either maintain capacity at 2007 levels and sustain mounting losses or cut capacity and commit an antitrust violation. Similarly, Plaintiffs' theory that Delta's initiation of a first bag fee after AirTran's October 23, 2008 statement violated Section 1 would put Delta to the same Catch 22 choice: either forego an important system-wide revenue enhancement or commit an antitrust violation.

Absent a factual basis for asserting a *quid pro quo* exchange of commitments or a demonstration of an abrupt and otherwise unexplainable departure from a prior course of action, neither of which Plaintiffs have pled, the attempt to premise a conspiracy on statements to investors fails the test of plausibility and cannot avoid dismissal. *See In re Travel Agent Comm'n Antitrust Litig.,* No. 03-30000, 2007 WL 3171675 (N.D. Ohio Oct. 29, 2007) ("action against self interest must be so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it.") *Id.* at \*11 n.2; s*ee also In re Flat Glass*, 383 F.2d at 360 (claim that defendant acted contrary to its interests "largely restate(s) the phenomenon of interdependence"); *Blomkest Fertilizer, Inc. v. Patash Corp. of Sask., Inc.*, 203 F.3d 1028, 10376 (8th Cir. 2000). *See In re Text Messaging Antitrust Litig.*, No. 08 C 7082, 2003 WL 506652 (N.D. Ill. Dec. 10, 2009) (parallel price increases in unit charges during period of

decreasing costs and overcapacity insufficient to survive motion to dismiss where defendant's actions could also be explained by common interest in influencing customers to accept monthly all-in fee).

**3.    AirTran's Cooperation With Delta In Airport Negotiations With The City of Atlanta (ATL) Provides No Support For Plaintiffs' Conspiracy Allegations.**

Plaintiffs allege "on information and belief" that AirTran and Delta sought to cement their alleged "capacity agreement" by limiting their gate leases at ATL while simultaneously locking other airlines out of Atlanta. (CAC ¶ 59). This allegation is based entirely on a February 2009 investor conference comment by AirTran that "AirTran and Delta have been working together" to deal with the City of Atlanta because their "interests [in ATL] are very closely aligned" in keeping the airport "low cost." Plaintiffs plead no facts to support their assertion that the "cooperation" extended to gate allocation and no information on actual lease terms with the City of Atlanta or how the contemplated lease renewals affected possible levels of operation for either airline. Moreover, Plaintiffs' conclusory allegations are internally contradictory because limiting Defendants' gate leases at Atlanta would facilitate, not "lock out," new entry.[8]

---

[8]  To the extent that Plaintiffs are claiming that AirTran and Delta were jointly seeking to persuade the public airport authority to limit new entry, that claim would be barred by the *Noerr-Pennington* doctrine.  *See McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1559 (11th Cir. 1992).

No plausible inference of unlawful conspiracy can arise from allegations

concerning AirTran's legitimate cooperation with Delta to restrain airport charges.

AirTran properly had common, rather than competitive, interests with Delta on the

issues on which AirTran and Delta cooperated.  *See* 49 U.S.C. §§47107(a)(1); (2);

14 C.F.R. Part 16; DOT Policy Regarding Airport Rates and Charges, 61 Fed. Reg.

31994 (June 21, 1996).

**III.** **Plaintiffs' Amended Complaint Fails To State A Plausible Claim Against AirTran Under Sherman Act Section 2.**

Apparently recognizing the absence of facts supporting a "conscious

commitment" binding AirTran and Delta, Plaintiffs retreat to the contention that

both AirTran and Delta were independently "attempting" to monopolize a large

number of city-pair markets.  (CAC ¶¶ 90-93).  Plaintiffs do not allege actual

monopolization, thus raising the threshold question whether it is plausible for both

defendants to have sought to monopolize the same markets and yet to have failed

in the attempt.

Plaintiffs' Section 2 claim is fundamentally infirm.  It is based on

inapplicable "shared monopoly" legal theory that the Eleventh Circuit has not

accepted and fails to allege the necessary elements of Section 2 claim against

AirTran.  To survive a motion to dismiss, a Section 2 plaintiff must allege facts

sufficient to plausibly establish that:  (1) defendant engaged in predatory or

anticompetitive conduct; (2) defendant acted with a specific intent to monopolize; and (3) defendant's actions created a dangerous probability of creating monopoly power in a relevant antitrust market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1074 (11th Cir. 2004). For this purpose, monopoly power is defined as the power to control price or exclude all competition in the relevant market. *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004). Plaintiffs fail to satisfy any of the three attempt requirements.

A.     **Plaintiffs Have Failed To Plead Predatory Or Anticompetitive Conduct.**

Plaintiffs' Section 2 count against AirTran relies on the same investor communications and cooperative airport dealing as its Section 1 count. Labeling AirTran's efforts to bolster the confidence of the investment community in AirTran's ability to survive a period of crisis, or AirTran's pursuit of common interests with Delta in dealing with a local airport authority, as anticompetitive or predatory acts has no case support. Indeed, the only case in which such communications were held to raise competition concerns—and then only as an unfair method of competition under the broad unfairness authority of FTC Act § 5—turned on Valassis' direct statement that it would set a floor price and not pursue its only competitor's customers if, and only if, there was a prompt

acknowledgment of reciprocity.  *In re Valassis Commc'ns, Inc.*, 2006 WL

1367833.  The contrast with the allegations in this case is stark.

Further, vague, noncommittal statements relating to system capacity and first

bag fees cannot plausibly lead to monopolization on individual routes.  Airlines

compete on specific routes using complex pricing arrays, specific schedules,

certain levels of service, and a variety of ancillary fees.  Airlines do not compete at

the aggregate or "system" level – either in terms of average price or in terms of

capacity.  The Eleventh Circuit has held that conduct incapable of producing a

monopoly is unable to satisfy the element of anticompetitive conduct.  *Spanish

Broad. Sys.*, 376 F.3d at 1075.  An agreement on first bag fees could not lead to the

monopolization of commercial air travel in Atlanta when such fees are only a small

part of the total price paid by a subset of customers.

> **B.** **Plaintiffs Have Failed To Plead That AirTran Acted With A Specific Intent To Monopolize**

Plaintiffs have alleged no facts supporting their claim that AirTran intended

to induce a continuing concert of action with Delta.  In fact, Plaintiffs' own

quotation of AirTran's October 23, 2008 remarks acknowledges that AirTran was

intending to be "more aggressive" against Delta as fuel prices declined.  (CAC

¶ 54).  At most, then, to show intent, Plaintiffs allege that AirTran knew that Delta

would have access to its investor presentations and could surmise that Delta might

react to them in setting its own strategy.  But "[a] plaintiff likewise cannot state an antitrust claim by showing only that the Defendants made price information publicly available and thus had the opportunity to conspire – a 'conspired in the open' sort of argument."  *LTL Shipping*, 2009 WL 232219, at *8; *see also* VI Areeda and Hovankamp, *Antitrust Law* ¶ 1432d, pp. 227-28 ("[I]f recognizing one's interdependence with rivals constituted conspiring, there would be no way consistent with other legal rules for an oligopolist to avoid conspiring.")

### C.   Plaintiffs Have Failed To Plead A Dangerous Probability That AirTran Could Monopolize Any Relevant Market

Attempted monopolization requires establishing a relevant product and geographic market.  *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993).  Plaintiffs' allegation that the relevant market is "domestic airline passenger service city pairs served by either Delta or AirTran" (CAC ¶ 66) makes no sense because AirTran *cannot* attempt to monopolize the hundreds of Delta routes that AirTran does not serve.  Plaintiffs' alternative "submarket"—"Delta and AirTran's domestic airline passenger service city pairs to and from [Atlanta], where both Delta and AirTran [allegedly] agreed to reduce capacity to increase fares" (CAC ¶ 67)—fails to specify any such city pairs.  Given Plaintiffs' failure to identify any change in behavior on any city pair, the definition is hopelessly

circular.  Thus, Plaintiffs lack any relevant market foundation for their allegation of dangerous probability.

The Eleventh Circuit also requires establishing that Defendants' allegedly anticompetitive actions, if successful, would actually confer monopoly power. *U.S. Anchor,* 7 F.3d at 1001.  As a general rule, this requires proving both a market share of at least 50 percent at the time the conduct is undertaken and a potentially significant expansion of that share through anticompetitive activity.  *Id.*

Plaintiffs make no allegation of AirTran's or Delta's market share on any of the city-pair routes they claim as relevant markets or submarkets.  Plaintiffs' allegation that AirTran has "22 percent market share" includes all city pairs originating at, terminating at, or even connecting via, Atlanta (CAC ¶ 69), a meaningless "airport enplanements" share rather than a city pair share.  Plaintiffs plead a similarly meaningless 70 percent Delta enplanement share in Atlanta and suggest that this combined 92 percent would confer monopoly power on individual city pairs.  Plaintiffs make no distinction between carriage of passengers originating or terminating in Atlanta and passengers using Atlanta merely as a transit point between other origins and destinations.  Transit passengers can, of course, be competed for by other carriers offering non-stop origin/destination services or services connecting the origin and destination through another transit

point.  Thus, the only market share "fact" alleged by Plaintiffs cannot plausibly establish monopoly power in any relevant market.

Equally fundamental, Plaintiffs must rely on a "shared monopoly" theory to establish a dangerous probability of monopolization by AirTran – *i.e.*, to push a market share involving AirTran over 50%.  The Eleventh Circuit has never recognized a claim of shared monopoly under Sherman Act § 2, and at least two circuit courts have explicitly frowned upon such claims.  *See Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003) ("a § 2 claim can only accuse one firm of being a monopolist"); *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1018 (2d Cir. 1989) (finding that the market shares of the two defendants "could not be aggregated to establish an attempt to monopolize in violation of Sherman Act section two").  There is certainly no reason for this Court to break new and questionable legal ground here.

Plaintiffs have cited to the Fifth Circuit's singular decision in *United States v. American Airlines, Inc.*, 743 F.2d 1114 (5th Cir. 1984), in their Rule 26(a)(1) Initial Disclosure.  In that case, American Airlines' CEO directly, privately, and colorfully requested that Braniff's CEO enter into pervasive, centralized and continuing price coordination and exclusion of potential entrants on all overlapping routes to/from Dallas-Fort Worth.  *Id.* at 1116.  The court described American's

conduct "as *uniquely* unequivocal and its potential, given the alleged market

condition, as being *uniquely* consequential." *Id.* at 1119 (emphasis added).

Recognizing that the Sherman Act does not reach attempts to enter into contracts,

combinations and conspiracies in restraint of trade and that it was at the outer edge

of § 2, the court justified upholding the Justice Department's complaint to ensure

that "naked proposals for the formation of cartels are discouraged." *Id.* at 1122.

The facts alleged in Plaintiffs' complaint differ vastly from in *American*

*Airlines*. First, *American Airlines* addressed a *direct* and *secret* contact between

chief executive officers, which created the possibility of a "moment of

acceptance," 743 F.2d at 1118, and a bargained exchange of commitments. By

contrast , the allegations here are public communications directed to investors

about business strategies and general market conditions, with no specificity about

any alleged relevant market.

Second, the American Airlines' CEO's offer had no purpose other than

seeking anticompetitive coordination and exclusion of other entrants.

Third, American unequivocally proposed to Braniff a centralized, command-

and-control partnership. By contrast, nothing AirTran said proposed continuing

joint coordination. The Fifth Circuit in *American Airlines* emphasized that it did

not seek to impose liability for "ambiguous" or "intemperate words." *Id.* at 1122;

*see also Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 108

(1st Cir. 1997) (rejecting *American Airlines* analogy without "unambiguously

anticompetitive conduct.").  Here, instead of a centralized regime (a "single

economic entity," *see Sun Dun, Inc. v. Coca-Cola Co.*, 740 F. Supp. 381, 391 (D.

Md. 1990)), the most AirTran's statements would have created would have been

continued interdependence– a "conspir[acy] in the open" denigrated by this

District Court.  *See LTL Shipping*, 2009 WL 323219, at *8.

     Given these distinctions, *American Airlines* provides no support for

permitting further pursuit of Plaintiffs' Section 2 claim.

**IV.    Plaintiffs' Antitrust Claims, Even If Plausibly Stated, Must Be
        Dismissed To Avoid Conflict With AirTran's Responsibilities Under
        Securities Law.**

     As a public company, AirTran's communications with investors are subject

to comprehensive SEC regulation.  The Supreme Court's recent decision in *Credit

Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007) reconfirmed the

teaching of *Silver v. New York Stock Exchange*, 373 U.S. 341 (1963) that where

antitrust law and securities law regulation overlap, the antitrust laws must yield.

The core of Plaintiffs' complaint calls into question public disclosures to AirTran's

investors consistent with the securities law, and Plaintiffs' requested relief would

bar AirTran from advising its investors of "actual and potential future competitive

actions concerning pricing and capacity cuts" (CAC ¶ 93). Thus, this Court must determine whether the complaint, even if it were plausibly to state an antitrust violation, can go forward without improperly invading a central area of SEC regulation. Because the short answer is no, dismissal is required.

The quarterly earnings calls at issue are a recognized adjunct to the formal reports public companies file with the SEC. They permit management to highlight key elements of the reports and to respond to questions of interest to the financial community. Since 2000, the SEC has encouraged public earnings calls under Regulation FD. 65 Fed. Reg. 51716, 51723 (Aug. 24, 2000).

From at least January 1, 2007 to today, AirTran's annual (10-K) and quarterly (10-Q) filings have included discussion of AirTran's expected future capacity levels, projected fare trends and fleet levels. AirTran also has filed timely 8-K disclosures when changing market conditions have persuaded management to modify its capacity projections. (*See, e.g.*, AirTran Form 8-K, January 26, 2007 (Appx. Exh. 2); AirTran 2006 10-K, March 1, 2007 (Appx. Exh. 3); AirTran Form 8-K, November 2, 2007 (Appx. Exh. 5).)

While Plaintiffs conclusorily assert that AirTran's earnings call disclosures "were not normal marketplace guidance" (CAC ¶ 91), it is clear that the earnings calls simply reiterated or discussed subject matter on public file at the SEC. (*See*

Exhibit A).  Moreover, AirTran's strategy and capacity disclosure practices were consistent with those of other airlines and thus permitted investors to evaluate AirTran's performance and management against meaningful industry benchmarks. (*See* American Airlines Q1 2008 10-Q, April 18, 2008 (Appx. Exh. 15); American Airlines Q2 2008 10-Q, July 17, 2008 (Appx. Exh. 33); United Airlines Q1 2008 10-Q, May 9, 2008 (Appx. Exh. 26); United Airlines Q2 2008 10-Q, July 24, 2008 (Appx. Exh. 34).)

The twin fuel and recession crises of 2008 heightened the need for meaningful discussion of changing conditions and how management intended to respond.  At the beginning of 2008 – a period when Plaintiffs acknowledge that AirTran and Delta were fierce rivals (CAC ¶ 20) – AirTran disclosed that rising fuel prices might cause it to curtail capacity.  (AirTran Form 8-K, March 19, 2008 (Appx. Exh. 14).)  As fuel prices continued to rise precipitously, and AirTran incurred first quarter losses, management disclosed a five-point program including capacity stabilization, fleet restriction, fare increases and use of ancillary fees as a response to stop the bleeding (AirTran Form 8-K, April 22, 2008 (Appx. Exh. 17)). By April 23, 2008 management had adopted and disclosed a plan to cut system wide capacity by 5 percent at the end of the busy summer season.  (AirTran Form 8-K, April 23, 2008 (Appx. Exh. 20).)  As fuel prices failed to abate, the

recession deepened and losses increased in the summer of 2008, management

revised its capacity projection downward. (AirTran Q2 2008 10-Q, August 11,

2008 (Appx. Exh. 37).) All of these disclosures were consistent with SEC

Regulations, and management would have been remiss had it not shared this

information with investors. *See* SEC Release Nos. 33-8350; 34-48960

(Management must provide "in a clear and straightforward manner" the "unique

perspective on the business that only [management] can present to investors.")

Even assuming *arguendo* that Plaintiffs could plausibly premise antitrust

claims on the disclosures made in AirTran's 2008 SEC filings and reprised in its

quarterly earnings calls, the viability of those claims must be examined under the

four-factor conflict test for foreclosing antitrust claims the Supreme Court set out

in *Billing, supra,* and the Second Circuit more comprehensively assessed in

*Electronic Trading Group, LLC v. Banc of America Securities, LLC,* 588 F.3d 128

(2d Cir. 2009). Where, as here, each factor is satisfied, dismissal is required.

**1. <u>The Antitrust Claims Arise In An Area Of Conduct Squarely Within The Heartland Of Securities Regulation.</u>**

Plaintiffs' claims almost entirely depend on statements AirTran directed to

its investors. Meaningful disclosure to investors, the central purpose of the

securities laws, is within the heartland of SEC regulation. *See id.* at 134

("heartland" is determined by the nature of the activity rather than the specific conduct of the defendant).

### 2. The SEC Has Clear And Adequate Authority to Regulate AirTran's Disclosure Activity.

Under Section 13 of the Securities Exchange of 1934 and Section 7 of the Securities Act of 1933 the SEC has unquestioned authority to regulate public company disclosure practices, whether in periodic reporting or prospectuses seeking new funds. In fact, "the SEC possesses considerable power to forbid, permit, encourage, discourage, tolerate, limit [or] otherwise regulate virtually every aspect of the [disclosure] practices." *Billing*, 551 U.S. at 276. This broad power clearly satisfies the second *Billing* test. *Banc of Am. Sec.*, 588 F.3d at 135.

### 3. SEC Disclosure Regulation Is Active And Ongoing.

There can be no doubt that "the SEC has continuously exercised its legal authority to regulate conduct of the general kind now at issue." *Billing*, 551 U.S. at 275. In Regulation S-K, Regulation FD and numerous releases, the SEC has actively regulated AirTran's disclosure actions.

### 4. There Is A Serious Conflict Between Plaintiffs' Antitrust Theory And The SEC Regulatory Regime.

In *Billing*, the Supreme Court expressed concern that the application of the antitrust laws to conduct regulated by the securities laws would "produce conflicting guidance, requirements, duties, privileges, or standards of conduct" that

would "inhibit permissible (and even beneficial) market behavior."  *Id.* at 275-76.

Allowing courts to draw the "intricate" line between disclosures required or

consistent with the securities laws, and conduct regulated by the antitrust laws,

would demand "securities-related expertise."  Case-by-case determinations of

whether communications were allowable under the securities laws runs the "risk of

inconsistent court results" that would inhibit meaningful disclosure to investors,

*Banc of America Securities*, 588 F.3d *at* 137, 138 (citing *Billing*, 551 U.S. at 282).

The Supreme Court expressed particular concern about antitrust allegations

that focused primarily on the "manner" in which activities regulated by the

securities laws were conducted.  551 U.S. at 278.  Attempting to subject the

"manner" in which a person acted under the securities laws to discipline under the

antitrust laws would first require the courts to determine how the securities laws

applied to the conduct.  As Justice Breyer asked rhetorically:  "And who but the

SEC itself could do so with confidence?"  *Id.* at 281.

Plaintiffs' complaint under Section 2 seeks a sweeping prohibition of future

statements to investors relating to "actual and potential future competitive actions

concerning pricing and capacity cuts"  (CAC ¶ 93) thus directly invading the

heartland of SEC disclosure regulation and seeking to impose a Sherman Act

limitation on SEC disclosure requirements.  Plaintiffs' Section 1 claim would deter

investor disclosures under Regulation S-K by focusing on their alleged impact on competitors rather than on the investor interests central to SEC regulation. As the Supreme Court and Second Circuit have observed, there would be no "practical way to confine" this antitrust suit so that it "challenge[s] only activity of the kind the [plaintiffs] seek to target" without inhibiting other conduct that is permitted or encouraged under the securities laws. *Billing*, 551 U.S. at 282; *see also Banc of America Securities*, 588 F.3d at 137.

As in *Billing*, no meaningful line can be drawn here. AirTran cannot be expected to determine how to disclose its capacity and pricing decisions in conformance with the Sherman Act while still avoiding securities liability for omitting material information in its public filings. "It is a lot to expect [AirTran] 'to distinguish what is forbidden from what is allowed,' so that [AirTran discloses] just so much information [to comply with Regulation S-K] – but not an iota more – or suffer treble damages." *Banc of America Securities*, 588 F.3d at 137 (quoting *Billing*, 551 U.S. at 280).[9]

---

[9] The Second Circuit also observed, in applying this *Billing* factor, that antitrust liability, with the prospect of treble damages, could have a harmful effect on the efficiency of markets. *Banc of America Securities*, 588 F.3d at 138. That "in terrorem" consideration alone was sufficient to cause that Court to find implied preclusion of the antitrust laws on this *Billing* factor in the matter before it. *Id.*

## CONCLUSION

For the foregoing reasons, Defendants request that the Court dismiss Counts I and II of the Complaint in its entirety for failure to state a claim on which relief can be granted.[10]

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>March 8, 2010</td><td></td></tr>
</table>

Respectfully submitted,

March 8, 2010

    /s/ Bert W. Rein
Bert W. Rein
**WILEY REIN LLP**
1776 K. Street N.W.
Washington, DC 20006
Phone: 202-719-7080
Fax: 202-719-7049
brein@wileyrein.com

Roger W. Fones
Michael V. Sachdev
Tejasvi Srimushnam
**MORRISON & FOERSTER LLP**
2000 Pennsylvania Ave., N.W.
Suite 6000
Washington, DC 20006
Phone: 202-887-1500
Fax: 202-887-0763
rfones@mofo.com
msachdev@mofo.com
tsrimushnam@mofo.com

---

[10] The undersigned counsel hereby certifies that these papers have been prepared with Times New Roman, 14 point, which is one of the font and point selections approved by the Court in L.R. 5.1(C).

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| IN RE: DELTA/AIRTRAN BAGGAGE FEE ANTITRUST LITIGATION | CIVIL ACTION NO. 1:09-md-2089-TCB<br><br>ALL CASES |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 8, 2010, I provided, via electronic mail and

U.S. Mail, Defendant AirTran's Motion to Dismiss the Consolidated Amended

Complaint and Memorandum of Law in support thereof, to the following attorneys

of record:

David H. Flint
Elizabeth L. Fite
SCHREEDER, WHEELER & FLINT
1100 Peachtree Street, Suite 800
Atlanta, GA 30309
dflint@swfllp.com
efite@swfllp.com

*Interim Liaison Counsel for Plaintiffs*

Daniel A. Kotchen
Daniel L. Low
KOTCHEN & LOW LLP
2300 M Street NW, Suite 800

Washington, D.C. 20037
dkotchen@kotchen.com
dlow@kotchen.com

*Interim Co-Lead Counsel for Plaintiffs*

James P. Denvir III
Scott E. Gant
Michael Mitchell
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015
JDenvir@bsfllp.com
SGant@bsfllp.com
MMitchell@bsfllp.com

*Counsel for Defendant Delta Airlines, Inc.*

/s/ Michael V. Sachdev
Michael V. Sachdev
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., N.W.
Suite 6000
Washington, DC  20006
msachdev@mofo.com

*Counsel for Defendant*

*AirTran Airways, Inc.*